**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| KATHLEEN MCCAFFERY | CIVIL ACTION |
|---|---|
| v. | NO. 18-5050 |
| **CREATIVE HAIRDRESSERS, INC.** d/b/a Hair Cuttery, and **RATNER COMPANIES, L.C.**, d/b/a Hair Cuttery | |

**Baylson, J.** January 13, 2020

### MEMORANDUM

**I.    Introduction**

Plaintiff Kathleen McCaffery was fired after just over thirty years of employment at Hair Cuttery,[1] much of it as a manager. Hair Cuttery says that it fired her because an internal investigation revealed that she was abusive towards her staff. Plaintiff, however, believes that comments made by management, as well as flaws in Hair Cuttery's investigation process and termination decision, suggest that she was fired because of her age and despite her long tenure with the company. She sued, bringing federal and state age discrimination claims under the Age Discrimination in Employment Act ("ADEA") and Pennsylvania human Relations Act ("PHRA").

Hair Cuttery now moves for summary judgment on all counts. It argues that its investigation and subsequent decision to terminate her were both sound, and that there is no evidence of age-based animus. Plaintiff argues in opposition that there is enough evidence for a reasonable factfinder to conclude that Hair Cuttery's investigation and subsequent decision were pretext for a discriminatory decision.

---

[1] Plaintiff sued two defendants, Creative Hairdressers, Inc., and Ratner Companies, L.C. Both are referred to as d/b/a Hair Cuttery. For simplicity, the Court will refer to both together as "Hair Cuttery" or "Defendant."

1

For the reasons stated below, Hair Cuttery's Motion for Summary Judgment will be denied.

## II. Procedural History

Plaintiff sued on November 21, 2018, ECF 1, and the case was assigned to Judge Kelly. Hair Cuttery answered on February 1, 2019. ECF 6. The parties conducted discovery until June 11, 2019. ECF 9 (scheduling order).

Hair Cuttery filed for summary judgment on June 25, 2019. ECF 10. Plaintiff responded on July 23. ECF 13. Hair Cuttery replied on July 30. ECF 14. Plaintiff filed a surreply on August 2. ECF 15. On November 7, upon Judge Kelly's retirement, the case was reassigned. ECF 16. The Court held oral argument on the Motion on December 16.

## III. Legal Framework

"The same legal standard applies to both the ADEA and the PHRA and therefore it is proper to address them collectively." Kautz v. Met-Pro Corp., 412 F.3d 463, 466 n.1 (3d Cir. 2005).

"Age discrimination claims in which the plaintiff relies on circumstantial evidence proceed according to the three-part burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015). That framework contains three steps. First, the plaintiff has the burden to "establish a prima facie case of discrimination." Ross v. Gilhuly, 755 F.3d 185, 193 (3d Cir. 2014). Second, once the plaintiff establishes a prima facie case, the defendant has the burden to "articulate a legitimate nondiscriminatory reason for the adverse employment action." Willis, 808 F.3d at 644 (quoting Jones v. Sch. Dist. of Phila., 198 F.3d 403, 412 (3d Cir. 1999)). Third and finally, "[i]f the employer satisfies th[e] second step, the burden shifts back once more to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual." Id. (quoting Burton v. Teleflex, Inc., 707 F.3d 417, 426 (3d Cir. 2013)).

A plaintiff may show pretext either by "point[ing] to evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action" or "point[ing] to evidence that would allow a factfinder to believe that an invidious discriminatory reason was 'more likely than not a motivating or determinative cause' of the employer's action.'' Id. at 645 (quoting Fuentes v. Perskie, 32 F.3d 759, 764–65 (3d Cir. 1994)).

To establish pretext by providing grounds to disbelieve the defendant's proffered rationale, the plaintiff's "evidence must indicate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons." Id. at 644–45 (quoting Fuentes, 32 F.3d at 765). However, it is only "at trial [that] the plaintiff must convince the factfinder that not only was the employer's proffered reason false, but the real reason was impermissible discrimination." Id. at 645 (citing Fuentes, 32 F.3d at 763); see Bulifant v. Del. River & Bay Auth., 698 Fed. App'x 660, 665 (3d Cir. 2017).

### IV.     The Parties' Contentions

The parties agree that Plaintiff has made out her prima facie case under McDonnell Douglas, and that Hair Cuttery has responded with a legitimate, nondiscriminatory reason that Plaintiff was terminated. They disagree about whether Plaintiff has provided sufficient evidence of pretext to survive summary judgment.

In seeking summary judgment, Hair Cuttery essentially rests on the integrity of its investigation. It argues that its grounds for terminating Plaintiff were "beyond reproach," and any inquiries about when Plaintiff would retire were mere "stray remarks" insufficient to provide evidence of discrimination. Defs.' Mem. Law in Supp. of Summ. J. ("Def. MSJ Mem.") at 9–10 (citing Hook v. Ernst & Young, 28 F.3d 366 (3d Cir. 1994)).

In opposition, Plaintiff argues that there were many problems with the problem leading up to her termination, and that a fact-finder could take the inquiry about retirement into account. Pl.'s Mem. Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl. MSJ Opp'n") at 14–20.

## V. **Factual History**

Plaintiff has worked for Hair Cuttery since March 18, 1988. Defs.' Statement of Undisputed Material Facts ("Def. SUMF") ¶ 6. Since 1988, Plaintiff has been the Salon Leader for a salon in Flourtown, Pennsylvania. Id. ¶ 7. Plaintiff has historically received strong performance reviews, Pl. MSJ Opp'n Exs. ("Pl. Exs.") C, D, and her salon is considered a "Million Dollar Salon," meaning that it earns one million dollars in sales annually, Pl. Ex. E ("Candeloro Dep.") at 38:13–24. As of the date of Plantiff's deposition, there were nineteen staff at the Flourtown salon. Pl. Ex. A ("Pl. Dep.") at 17:1-12.

Only one set of age-based comments were ever made to Plaintiff. Def. SUMF ¶ 14. On March 28, 2018, several of Plaintiff's managers—Regional Leader Barbara Allen, District Leader Debbie Candeloro, and District Leader Peg Aversa—visited the Flourtown salon to celebrate Plaintiff's thirty years of service and Plaintiff's Assistant Salon Leader Elaine Lassiter's twenty years of service. Id. ¶ 11. During this visit, Aversa asked "If she thought she would still be doing this after 30 years," and Allen asked "How long do you plan on working behind the chair?" and "Do you think about retiring?" Id. ¶ 11. Plaintiff says that she responded that she "loved [her] job" and that she "would probably drop dead behind the chair." Plaintiffs' Response to Def. SUMF ("Pl. Resp. to Def. SUMF") ¶ 11. Plaintiff also says that after Allen and Aversa asked these questions, "everyone laughed and took pictures."[2] Def. SUMF 13.

---

[2] Allen, Aversa, and Candeloro all deny that Allen or Aversa asked these questions. Id. ¶ 12. Given that this is a summary judgment motion, the Court will assume that a jury could find that the comments were made. See In re Chocolate Confectionary Antitrust Litig., 801 F.3d 383, 396

During the March 28 visit, Allen, Candeloro, and Aversa used the back room of the salon to discuss an inventory issue with Lassiter and another Assistant Salon Leader. Id. ¶ 16. Plaintiff may have participated in the conversation. Id. ¶ 16; Pl. Resp. to Def. SUMF ¶ 16. Although Plaintiff denies "yell[ing] or rais[ing] her voice," Pl. Resp. to Def. SUMF ¶ 16, according to Allen, Plaintiff yelled "about inventory, and indicated that the person at the company in charge of inventory 'doesn't know what he's talking about.'" Id. ¶ 16. After Plaintiff left, the Assistant Salon Leaders may have told Allen, Candeloro, and Aversa that Plaintiff had angry outbursts frequently.[3] Def. SUMF ¶ 18–19. Plaintiff maintains that she "was never degrading or hostile with her staff and denies ever making inappropriate comments," Pl. Resp. to Def. SUMF ¶ 18.

While in the back room, Allen noticed that "Associate Productivity Reports" (APRs) posted on a door contained potentially derogatory statements, id. ¶ 20, such as "your HHC sucks," Pl. Ex. F ("Allen Dep.") at 21:14–19. There is no question that the statements appeared on the APRs on the day in question. Plaintiff also testified that she has left such notes on APRs for twelve years, and prior to her termination, she was never told such comments were inappropriate.[4] Pl.

---

(3d Cir. 2015) (requiring Courts to view the record "in the light most favorable to the nonmovant, drawing reasonable inferences in its favor").

[3] Throughout her Response to Hair Cuttery's Statement of Undisputed Material Facts, Plaintiff objects on "hearsay and double-hearsay" grounds to the statements of salon employees, like the Assistant Salon Leaders, who were not deposed and did not submit affidavits. The Court will disregard these objections. These statements are generally offered for their effect on the listener—whether Hair Cuttery management believed Plaintiff to be a bad manager—rather than their truth—whether she actually was. See Fed. R. Evid. 801(c)(2). Moreover, the employees were specifically identified and could presumably testify at trial, and "[i]n this circuit, hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial," Shelton v. Univ. of Med. & Dentistry of N.J., 223 F.3d 220, 223 n.2 (3d Cir. 2000); cf. Robinson v. Hartzell Propeller Inc., 326 F. Supp. 2d 631, 645 (E.D. Pa. 2004) (DuBois, J.) ("[H]earsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony[.]").

[4] Plaintiff notes that Candeloro must have been aware of the potentially derogatory comments before the March 28 incident. Candeloro regularly visited the Flourtown salon. Candeloro Dep. at 28:3-5. She testified that she had "always seen the APRs," id. at 127:25–128:1, and that "they

5

Resp. to Def. SUMF ¶ 20 (quoting Plaintiff Dep. at 99). According to her, the comments were meant as jokes and reflected the camaraderie she had with her staff. Id. She also maintains that other staff members would write similar notes, and that such "jokes" are acceptable in her industry. Id.

Hair Cuttery claims that around one week later, it received another complaint about Plaintiff. A Flourtown salon employee named Justina Lee who was returning to work from a leave of absence told Candeloro that she feared asking Plaintiff for a needed scheduling accommodation. Candeloro Dep. at 57:22-24; Def. SUMF at ¶ 21–22. Plaintiff denies that such a complaint ever occurred, or "ever making negative comments to Lee about her leave of absence." Pl. Resp. to Def. SUMF ¶ 21–22.

A few weeks later, another Flourtown salon employee, Sueanne Badeau, contacted Hair Cuttery to complain. Allen Dep. at 35:7-13. When Allen spoke to her, Badeau complained about Plaintiff's "bull[ying]" and "inconsistent" conduct. Def. SUMF ¶ 24; Allen Dep. at 35:4-13. Plaintiff denies the substance of Badeau's complaint in its entirety, but acknowledges that Badeau "may" have complained. Pl. Resp. to Def. SUMF ¶¶ 23–25.

Based on the events of March 28, and the Lee and Badeau complaints (to the extent that those events and complaints happened), Hair Cuttery charged Sandy Ruth, an Associate Relations Advisor, with conducting a "Pulse Survey." Def. SUMF ¶¶ 26–27. Plaintiff appears to dispute that these events and complaints were the reason for the Pulse Survey. Pl. Resp. to Def. SUMF ¶ 26.

---

weren't always negatively written on," id. at 128:1-2. Plaintiff insists that, since she had left purportedly derogatory comments on the APRs for twelve years, and Candeloro had visited regularly, Candeloro must have previously observed APRs containing similar comments. See Pl.'s Surreply in Further Opp'n to Defs.' Mot. for Summ. J. at 2–3.

A Pulse Survey consists of interviews with salon professionals intended to elicit their "honest feedback." Def. SUMF ¶ 26. Staff conducting a Pulse Survey are required to interview all staff at the salon. Pl. Resp. to Def. SUMF ¶ 26. Before Ruth carried out the survey, Candeloro "did ask Cass [Plaintiff] to let us go thru the process and not to contact any of her Sps [(Salon Professionals)] to either warn them or let them know that I was going to be in the salon to speak to everyone. [Candeloro] asked that Cass let us go through the process of the Pulse Survey. Cass agreed." Def. Ex. H.

Ruth visited the Flourtown salon on April 23 and 24 to conduct the Pulse Survey. Def. SUMF ¶ 28. At the Pulse interviews, Ruth used "Honest Feedback" forms to gather employees' feedback. Pl. Ex. K. Rather than having the employees themselves fill in the forms, Ruth filled out the forms for the employees while they spoke. Pl. Resp. to Def. SUMF ¶ 29. Some employees felt that Ruth "was looking for any possible negative information about" Plaintiff. Pl. Dep. at 50:5-17. Ten such forms were filled out. Pl. Ex. K. The forms contained a mix of positive, negative, and neutral feedback on Plaintiff. Id. Plaintiff has denied all of the negative feedback. Pl. Resp. to Def. SUMF ¶ 29.

At some point during the Pulse Survey, Plaintiff became aware that she was the subject of the Survey. According to Plaintiff, salon employees voluntarily told her as much. Pl. Dep. at 48:10–54:2. However, Ruth later reported that she heard from one salon professional that Plaintiff was interrogating salon professionals to try to learn who had contacted Human Resources. Def. Ex. H.

Shortly after midnight on April 30, Ruth wrote an email to Allen, Candeloro, Aversa, and other Creative Hairdressers, Inc. employees summarizing the results of the Pulse interviews. Def. Ex. H. Ruth's email stated that it was "very clear that there are some SPs who are quite happy

with Cass [Plaintiff], a few who were clearly fearful to speak, and Many [sic] who shared they are not happy at all with Cass and her behaviors in the salon and how she treats the team." Id. She went on to claim that Plaintiff engaged in various forms of abusive conduct, such as spoken verbal abuse, insulting comments on APRs, and a category of conduct explicitly titled "Threats or treats"[5] where she would give salon professionals "treats" or yell at them depending on the quality of their work. Id. Ruth also reported in her email that four employees were seriously considering resigning. Id. This feedback was not reflected in any of their Honest Feedback forms. Ruth Dep. at 72:8–73:4. Ruth did not discuss the positive feedback at any length in her email. Def. Ex. H.

After reviewing all of the reports from salon professionals, Ruth recommended "moving forward that we terminate Cass. Cass violates our Fair and Equal Treatment Policy Level 4 #12 Engaging in or failing to enforce non-discrimination and equal treatment policies and/or retaliating against, or harassing any associate or guest," because "[t]he notes written on the APRs are harassing, as is her behavior in the salon. Her trying to figure out who called into HR is retaliation." Id.

Hair Cuttery management ultimately decided to characterize Plaintiff's conduct as two different "Level 4 Violations" and terminate her. See Def. Ex. K. Specifically, they concluded that Plaintiff had committed two types of Level 4 Violation:

> #9—"Engaging in fighting, extreme aggressive behavior, or other acts of violence on company premises or while on company business, making threats of any kind against Guests, Leaders or other Associates"; and

---

[5] Plaintiff does not dispute, and in fact put in an affidavit from a salon professional, that she wrote potentially insulting comments on APRs or engaged in conduct called "Treats or Threats." Pl. Ex. H; see also Pl. Dep. at 91:16–92:9. According to the affidavit, "Treats or Threats" was used to "award [salon professionals] for stellar performance." Id. ¶ 3. The salon professional "perceived same to be a joke, and was never offended by any comments made on the APRs or the 'Treats or Threats.'" Id. ¶ 4.

8

> #12—"Engaging in or failing to enforce non-discrimination and equal treatment policies and/or retaliating against, or harassing any Associate or Guest."

See Def. Exs. K, L. Per Hair Cuttery's "Salon Operations Manual," the penalty for a first Level 4 Violation is "termination." Def. Ex. L. Hair Cuttery management did discuss taking steps short of termination, but decided on termination regardless. See, e.g., Pl. Ex. I ("Ruth Dep.") at 118:5–8, 119:21–121:14.

It is not clear whether management's discussion of possible steps short of termination included Level 3 Violations. Per the Salon Operations Manual, a first Level 3 Violation receives a "[W]ritten warning and disciplinary action." Def. Ex. L. Termination does not take place unless there is a second offense of the same type within twelve months of the first. Id. Level 3 Violations include:

> #1—Mistreating Guests and/or other Associates (e.g., name calling, gossiping, intimidating, unprofessional conduct, harassing or verbally abusing)
>
> #3—Using profane or obscene language in front of Guests and/or other Salon Professionals
>
> #11—Refusing to cooperate with or compromising the integrity of a company-sanctioned internal or external investigation.

Id.

At some point on April 30, Candeloro called Plaintiff and left her a voicemail. Pl. Ex. N. When they spoke on May 1, Candeloro asked Plaintiff to meet with her, along with Allen and Ruth, the next day to discuss the results of the Pulse Survey. Id. On May 2, Allen, Candeloro, and Ruth met with Plaintiff and terminated her. Pl. Ex. O.

The current Salon Leader for the Flourtown Salon was around thirty-nine years old at the time she was promoted to Salon Leader. Pl. Ex. P at 4.

## VI. Discussion

To survive summary judgment, Plaintiff need not discredit Hair Cuttery's proffered rationale in its entirety. Some contrary evidence "may so undermine the employer's credibility as to enable a rational factfinder to disbelieve the remaining rationales, even where the employee fails to produce evidence particular to those rationales." Tomasso v. Boeing Co., 445 F.3d 702, 707 (3d Cir. 2006) (citing Fuentes, 32 F.3d at 764 n.7).

Here, Plaintiff has submitted evidence from which a reasonable jury could conclude that Hair Cuttery's proffered grounds for her termination were pretextual. A jury could find serious problems with at least three aspects of Hair Cuttery's proffered rationale, and could also find evidence that relevant decisionmakers harbored age-based animus. These issues may allow a reasonable jury to question Hair Cuttery's proffered rationale, as well Hair Cuttery's credibility, and conclude "that the employer's actions could not have been for nondiscriminatory reasons," Willis, 808 F.3d at 644–45. Taken together, therefore, these issues require the Court to deny summary judgment.[6]

First, a reasonable jury could doubt the legitimacy of the Pulse Survey and Hair Cuttery's reliance on the survey. A reasonable jury might be troubled that some salon employees felt that Ruth was only looking for negative feedback. Also, Ruth only interviewed ten employees out of nineteen. A reasonable jury could conclude that this undermines the substance of the Pulse Survey. Because the remaining employees could have given positive feedback. Per an affidavit submitted as part of Plaintiff's opposition, at least one remaining employee would have. Also, the failure to

---

[6] To be clear, these issues are not the only issues on which the jury could make a finding supporting an ultimate finding of pretext. Nor does the Court's conclusion that these issues, taken together, are sufficient to deny summary judgment does not mean that the Court has formed any opinion on whether any or all must be resolved in Plaintiff's favor in order for a jury to find in her favor at trial.

10

interview all nineteen employees may undermine the integrity of the survey process because it is an apparent violation of company policy. Furthermore, Ruth's email to her colleagues reported strongly negative feedback—that four salon professionals intended to leave if salon management did not improve—that was not reflected in the written records of the Pulse Survey. A reasonable jury might doubt the accuracy of this report. Finally, a jury could find that the positive feedback in the Pulse Survey outweighed or even contradicted the negative feedback, raising questions about how Ruth characterized the results of the Pulse Survey. These problems could all suggest pretext to a reasonable jury.

Second, Plaintiff maintains that she did not engage in much of the supposed conduct that supported Hair Cuttery's finding of two types of Level 4 Violations. For example, Hair Cuttery has pointed to her "Treats or Threats" practice as evidence that Plaintiff committed the Level 4 Violation of "making threats of any kind against . . . Associates." However, Plaintiff maintains that she never made a real threat as part of "Treats of Threats." A reasonable jury could find that Plaintiff is credible on this point. And, having found her credible, the jury could find that there was no Level 4 Violation of this type. For another example, Ruth cited Plaintiff's purported efforts to ferret out who complained to HR as evidence that she committed the Level 4 Violation of "retaliating against . . . any associate." But Plaintiff maintains that made no such efforts. Again, a reasonable jury could accept Plaintiff's testimony, making it harder for Hair Cuttery to demonstrate that Plaintiff committed a Level 4 Violation. It may be the case that whether the misconduct occurred is less probative of Hair Cuttery's state of mind than whether Hair Cuttery believed the misconduct occurred. But a finding that the misconduct did not occur could still critically undermine Hair Cuttery's insistence that its decisionmaking process was "beyond reproach," making it less credible and suggesting pretext to a reasonable jury.

11

Third, a reasonable jury could reject Hair Cuttery's decision to characterize Plaintiff's purported misconduct as Level 4 Violations, which require immediate termination, rather than Level 3 Violations, which do not. Level 3 Violations include 3:1, "Mistreating Guests and other Associates," 3:3, "Using profane or obscene language," and 3:11, "Refusing to cooperate with or compromising the integrity of a company-sanctioned internal or external investigation." A reasonable jury could find that categories 3:1, 3:3, and 3:11 fit Plaintiff's purported misconduct as well as or even better than the Level 4 categories that Hair Cuttery ultimately chose. A reasonable jury could so find even if it also concluded the misconduct actually occurred. Especially in light of the other potential evidence of pretext discussed above, Hair Cuttery's decision to err on the side of swifter, harsher punishment could support a jury finding that its proffered grounds for termination are pretextual.

Finally, the alleged comments at the celebration of Plaintiff's thirty years of employment could provide evidence of animus and that Hair Cuttery's proffered rationale is pretextual. When an employee is discharged, evidence of whether a decisionmaker held age-based animus is "relevant to determining whether the discharge decision resulted from discriminatory motives." See Abrams v. Lightolier Inc., 50 F.3d 1204, 1214 (3d Cir. 1995); cf. Walden v. Ga.-Pac. Corp., 126 F.3d 506, 521–22 (3d Cir. 1997) ("[S]tray remarks are not categorically excludable even though not directly connected to the particular employment decision at issue."). Here, a reasonable jury could conclude that key decisionmakers made comments suggesting that they hoped Plaintiff would retire soon. Based on these comments, a reasonable jury could infer that those decisionmakers held age-based animus, and that Hair Cuttery's proffered rationale is pretextual.

Ultimately, the Court concludes that a reasonable jury could choose to disbelieve Hair Cuttery's proffered reason for Plaintiff's termination. That is all that is required for Plaintiff to survive summary judgment.

## VII. <u>Conclusion</u>

For the foregoing reasons, Hair Cuttery's Motion for Summary Judgment will be denied. An appropriate Order follows.

O:\CIVIL 18\18-5050 McCaffery v Creative Hairdressers\18cv5050 SJ Mem.docx

13